(Reap. Dec. 11039)

UNION CARBIDE CORPORATION *v.* UNITED STATES

Entry Nos. NF 10417, NF 11012, NF 11116, NF 11200, NF 11374, NF 11483, NF 11528, NF 11731.

(Decided July 7, 1965)

*Otto Kinzel; Barnes, Richardson & Colburn (Joseuh Schwartz of counsel)*, associate counsel; for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise of this appeal consists of certain wash-and-wax sponges which were imported at Niagara Falls, N.Y., from Canada, and appraised at Canadian $0.634 each, on the basis of constructed value, as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). Plaintiff principally contends the proper basis of appraisement to be export value, as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956), and that such export value is the invoiced and entered value of Canadian $0.275 for merchandise exported between April 20, 1961, and May 10, 1961, and Canadian $0.271 for merchandise exported subsequent to May 10, 1961. Alternatively, plaintiff contends for the same unit values based upon constructed value, as defined in section 1401a(d). Defendant contends that the evidence does not support the claimed unit values under either basis of valuation relied upon by the plaintiff. It is conceded that the involved merchandise does not appear on the Secretary's final list, and that appraisement is governed by the provisions of section 1401a.

It appears from the record that the subject merchandise was manufactured in Canada by Union Carbide, Canada, Ltd., of Toronto, Canada, and thereafter sold to Union Carbide Consumer Products Co. of Philadelphia, Pa. These two firms are affiliated with Union Carbide Corporation, the plaintiff-importer herein. The business of these firms is to manufacture consumer products and sell them to wholesalers and to others who sell at retail.

At the trial, Henry Lionel Tipple, manager of new products development of the consumer products division of Union Carbide, Canada, Ltd., and John Robert MacArthur, manager of accounting in the same firm, testified on behalf of the plaintiff. There were also offered in evidence on plaintiff's behalf a specimen wash-and-wax sponge, representative of the merchandise at bar (plaintiff's exhibit 1), and a sample of the "blister" package in which the sponge was sold in the home market in Canada (plaintiff's illustrative exhibit 2). Defendant did not call any witnesses, and confined itself to the cross-examination of plaintiff's witnesses.

From the evidence, the following pertinent facts appear: The merchandise consists of a plastic sponge whose interior is impregnated with detergents and waxes, and one surface of which is treated with an abrasive material. Some of the raw materials, namely, the un-

impregnated sponge and certain chemicals with which the sponge is impregnated, are imported from the United States, although not from Union Carbide Corporation. The sponge, as imported, is a new product which was developed in the United States. As of the time of the involved importations, Union Carbide, Canada, Ltd., was the sole manufacturer of these sponges in Canada. The sponge was developed for the primary purpose of facilitating the cleaning and waxing of automobile bodies, with the abrasive surface being used for the removal of more stubborn dirt and mud which cling to the wheels and hub caps of an automobile.

The Union Carbide Consumer Products Co. was the sole purchaser of these sponges for exportation to the United States. As previously indicated, the price to Union Carbide Consumer Products Co, for exportation to the United States was Canadian $0.275 per sponge for sponges exported prior to and including May 10, 1961, and Canadian $0.271 per sponge for sponges exported after May 10, 1961. The reduction in price is attributed to the fact that there was a reduction in cost of one of the component materials, and the savings were passed on to the purchaser. These sponges, comprising some 500,000 all told although only a little over 400,000 are involved in the instant importations, were packed and shipped in bulk in cartons containing approximately 50 to 150 sponges. The transactions involved no advertising costs to the exporter.

Other circumstances of the instant export transactions are that the merchandise was acquired on an outright purchase and sale basis; that the purchase prices were arrived at "by cost plus a profit margin"; that, during the period of exportation of the involved merchandise, the manufacturer did not offer such merchandise in bulk to anyone but the purchaser herein for exportation; that no restrictions were imposed on the purchaser as to disposition or use of the merchandise; and that the selling prices were not dictated or controlled in any way by Union Carbide Corporation, and did not vary according to quantity purchased. All of the sales for exportation to the United States were made f.o.b, Toronto, the exporter's principal place of business. The elements comprising the involved export prices are as follows (R. 36–37, 40):

| | May 10, 1961, and prior | After May 10, 1961 |
|---|---|---|
| Materials | $163. 98 per thousand | $159. 98 per thousand |
| Fabrication | 10. 03 " " | 10. 03 " " |
| General Expenses | 53. 71 " " | 53. 71 " " |
| Containers and expenses to U.S. | 6. 11 " " | 6. 11 " " |
| Profit | 41. 17 " " | 41. 17 " " |
| Total | $275. 00 " " | $271. 00 " " |

The involved merchandise was also sold and offered for sale in Canada by the manufacturer for home consumption during the period of the involved exportations. Sales in the home market were made mainly to wholesalers, department stores, and others who sold at retail, and at a price of Canadian $0.79 per sponge. The sponge, as sold in the home market, was contained in what is described as a "blister package," the cost of which was not recollected by plaintiff's witness, and was sold, 24 to a carton, to customers numbering from 100 to 200 who purchased in smaller quantities spread over about 2,000 orders. The home price represented "plant costs" (materials and fabrication) of just over 30 cents. Other costs which influenced the price in the home market were the aforementioned blister packaging which was said to be quite expensive, advertising costs, labor costs in handling numerous orders involving smaller quantities, freight to all points in Canada, a Canadian Federal sales tax of 11 per centum, and a 2 per centum cash discount.

The applicable provisions of section 1401a read as follows:

### Export value

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

### Constructed value

(d) For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

### Definitions

(f)  For the purposes of this section—

(1)  The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(B)  in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### Transactions between related persons

(g)  (1)  For the purposes of subsection . . . (d) of this section . . . a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement.  If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2)  The persons referred to in paragraph (1) are:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(E)  Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outsanding voting stock or shares of any organization and such organization; . . .

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The first question to be determined is, do the invoice prices of the involved exportations fairly reflect the market value of such merchandise so as to support a finding of export value based thereon?  In resolving this question, it is proper to take into consideration all sales made by the exporter in the ordinary course of trade, including sales made in the home market.  *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841.  Plaintiff contends that if there is a fair explanation of the reasons for the difference between the export price and the home market price, or if the export price includes the production costs, general expenses entering into export transactions, and profit, then the export price does fairly reflect the market value of the merchandise.  The difficulty with this contention is first, that while plaintiff has adduced evidence identifying and allocating costs, and reducing the same to a unit cost insofar as export prices are concerned,

it has not undertaken to do as much with respect to home market costs. The only ascertainable element in the home market price which identifies with a like element in the export prices is the item of "plant costs," and this is above the export prices by over 3 cents on a unit cost basis. The costs of other elements purportedly influencing the home market price have not been disclosed in the evidence. As such, the court is unable to determine from the evidence how such elements bear upon or affect the home market price, and as a corollary, how the home market price compares with the export prices. Under the evidence, the court is left with the necessity of conjecturing about whether the home market price differs from the export prices only to the extent that the home market price reflects conditions peculiar to the home market. It is not suficient to suggest the presence of elements influencing a market price without also furnishing evidence as to *how* such elements affect the price.

Secondly, the existence of an export value does not turn on the application of any empirical formula to a claimed price. It is the market price which determines value, and not the structured elements contained therein. Of course, the presence or absence of particular elements in an alleged price are factors which bear upon and influence a determination as to whether a statutory price exists. But these elements themselves do not represent the price. This distinction is implicit in language employed by the court in *United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, A.R.D. 152, which was approved by the Court of Customs and Patent Appeals in *United States* v. *Acme Steel Company*, *supra*. In that case, the appellate term, while speaking of an export price under section 1401a(b), stated, at page 537:

> It [the record] also establishes that the invoice prices were equal to the sum of the production costs, general expenses entering into export transactions and profit, *and that such prices fairly reflected the market value for exportation to the United States.*

> This we consider to be substantial evidence of a *price which embodies all of the material elements* entering into the new statutory definition of export value in the case of sales to one or more selected purchasers. [Emphasis added.]

Even with the exclusion from the home market price here involved of certain elements peculiar to the Canadian market, it has not been established in the evidence that what is left is equal to or approximates the prices in the export market. And nothing in the evidence establishes that prices in the Canadian market were predicated on a cost plus profit margin basis in the ratio which is reflected in the export prices, if indeed at all. On this record, plaintiff has failed to establish by competent evidence that the invoice prices fairly reflect the market value of the involved merchandise. As such, an export value cannot be predicated upon these prices.

The next question to be determined is whether the invoice prices properly represent the constructed value of the merchandise as against the appraised values, it being conceded that constructed value, as defined in section 1401a(d), is the proper basis of valuation, if no export value exists for the merchandise. Plaintiff contends that the appraisement is invalid because the appraiser presumably found a constructed value by taking the home market price and making certain deductions therefrom. Plaintiff argues that section 1401a(d) requires that constructed value be based upon an approximation of costs incurred in exporting the merchandise to the United States. There is in the record, however, no evidence which points up how the appraiser arrived at his determination. And the court cannot supply this void with speculation as to the guidelines adopted in the appraisement.

There is in the record evidence to the effect that general expenses incurred in exporting such merchandise to the United States should include an item of costs which was excluded from the prices contended for here by the plaintiff. It was brought out in the evidence that the plastic impregnated sponge, being a new product that was developed in the United States, would, in some instances, be burdened with an item of development costs in the export price. Thus, in dealings between related companies, such as the principals here involved, these development costs would be excluded from the price. They would be included, however, in export sales consummated between unrelated companies. The court notes that the exporter's accountant testified that the item of development costs would not affect the export price structure because the item would be absorbed in the general expenses, thereby reducing the profit margin. The witness was unable to state, however, with respect to an unrelated company transaction, whether it was normal to increase the price so that the profit margin would be maintained. The witness stated that pricing of the merchandise was not within his area of responsibility.

The court is disinclined to accept the testimony concerning *the stability of export price irrespective of the addition or omission*, as the case might be, *of the item of development costs*, limited as this testimony is "to the situation where the price would remain the same," and in the absence of evidence of the exporter's pricing policy with respect to the addition of development costs in unrelated company transactions. This leaves only the depressed invoice prices which the court rejects under the "related parties" rules applicable herein for the reason that they do not reflect the elements of a fair export market value of the subject merchandise for constructed value purposes, in the court's opinion. Since there exists in the record no alternate

proof of elements of value supporting a constructed value different from that returned by the appraiser, the court cannot say that the general expenses necessarily included in the appraiser's return do not constitute the best evidence available as to what the amount would have been if the transaction had occurred between unrelated persons. *John V. Carr & Son, Inc.* v. *United States*, decided May 20, 1965, 52 CCPA 62, C.A.D. 860. It follows, then, that the plaintiff has not overcome the burden imposed upon it under the statute.

On the record in this case, the court finds as facts:

1. The merchandise consists of impregnated wash-wax sponges, exported by Union Carbide, Canada, Ltd., from Canada between April 20 and May 23, 1961.

2. The merchandise was appraised on the basis of constructed value, as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

3. The merchandise does not appear on the final list of the Secretary of the Treasury, T.D. 54521.

4. The merchandise was sold for exportation exclusively to Union Carbide Corporation, New York, a selected purchaser at wholesale, and a person related to the exporter of the merchandise.

5. The merchandise is a new product which was developed in the United States and produced in Canada by the exporter, and there was no other Canadian manufacturer of merchandise of the same general class or kind during the period in question.

6. The plaintiff has failed to prove that, at or about the times of exportation of the subject merchandise, such merchandise was freely sold or offered for sale in Canada to all purchasers at wholesale for exportation to the United States at a price which fairly reflected the market value of the merchandise.

7. The plaintiff has failed to prove that the amount in the invoice prices of the merchandise purporting to represent the general expenses incurred in the production of the merchandise fairly reflects an amount for general expenses usually reflected in sales of merchandise of the same general class or kind which are made by producers in Canada for shipment to the United States.

As conclusions of law, the court finds.

1. The evidence does not overcome the presumption of correctness supporting the appraised value of the merchandise.

2. The proper basis of valuation of the merchandise is constructed value, as defined in section 1401a(d).

3. Such value is the appraised value.

Judgment will be entered accordingly.