(Reap. Dec. 11152)

C. J. TOWER & SONS OF BUFFALO, INC. v. UNITED STATES

Entry No. 23368, etc.

(Decided March 7, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

NICHOLS, Judge: The merchandise involved in this case consists of new unfinished brakeshoes, exported from Canada by Aimco Automotive Parts Co. of Toronto, and Cooksville, Canada (hereinafter called Aimco, Canada), to Aimco Automotive Parts Co. of Buffalo (hereinafter called Aimco, Buffalo). The merchandise was entered at the port of Buffalo in April, May, and June 1963, at the unit invoice prices and was appraised at higher unit values in Canadian dollars, less 5 percent, less 2 percent, packed. The appraisement was on the basis of constructed value, as that value is defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification

Act of 1956. It is claimed that appraisement should have been made on the basis of export value, as defined in section 402(b) of said tariff act, as amended, and that said value is represented by the invoice unit prices, which were the prices to a selected purchaser and are claimed to fairly reflect the market value of the merchandise.

The pertinent provisions of said tariff act, as amended, are as follows:

SEC. 402.   VALUE.

\*       \*       \*       \*       \*       \*       \*

(b)   EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*       \*       \*       \*       \*       \*       \*

(d)   CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1)   the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2)   an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3)   the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*       \*       \*       \*       \*       \*       \*

(f)   DEFINITIONS.—For the purposes of this section—

(1)   The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A)   to all purchasers at wholesale, or
(B)   in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise.

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

Four witnesses testified for the plaintiff at the trial: (1) Irving Goodman, a partner and general manager of Aimco, Canada, in charge of production and sales; (2) Albert Haworth Carter, plant manager of Aimco, Canada, who also serves as purchasing agent and is in charge of personnel, capital expenditure purchasing, and costing of the commodities the firm manufactures; (3) Alan Marvin Alber, comptroller of Aimco, Canada, and a chartered accountant; and (4) Morris Feldman, a chartered accountant and external auditor of Aimco, Canada. Documentary evidence, hereinafter referred to, was introduced by both parties.

Aimco, Canada, is a manufacturer of brakeshoes, which are part of the wheel assembly which stops a car or truck. The merchandise before the court (unfinished brakeshoes) is designated by a great many different item numbers, representing different sizes or types for different vehicles. Plaintiff's exhibit 3 is a summary of the item numbers covered by the invoices herein. Unfinished brakeshoes are converted into finished brakeshoes by so-called bonders who burn off the oil, wheelibrate, and bond an asbestos lining to the shoes. Bonders sell brakeshoes through warehouse distributors, jobbers, or chain operators to service stations and garage operators. During the period involved herein, Aimco, Canada, sold unfinished brakeshoes to Canadian bonders (exhibit 5, exhibit A), to Aimco, Buffalo (exhibit 5, exhibit A), and to other countries (exhibit A). During this time, the merchandise was also offered in Canada to warehouse distributors and original equipment manufacturers including General Motors, Ford, and Chrysler, but the offers were not accepted because Aimco, Canada, did not have a product acceptable to them. One sale was made to Chrysler for their "all-make" program for foreign vehicles. (Exhibit A, p. 6.) An offer made to Ford is included in exhibit A (attachment G), but the prices quoted do not correspond to those listed on either exhibits 6 or 7. An explanation appears in exhibit A, page 5, to the effect that models needing revision were increased in price while those meeting Ford specifications were quoted at lower than standard prices.

The only sales for exportation to the United States were made to Aimco, Buffalo. (Exhibit A.) Aimco, Buffalo, is a distributor of unlined brakeshoes in the United States and sells to bonders and warehouse distributors in the United States. (Exhibit A.)

Aimco, Canada, and Aimco, Buffalo, are two different companies, operating in different offices and with different sets of books, but the principal owners of both are five brothers (one of whom was the witness Goodman).

Aimco, Canada, has a pricelist for sales to bonders in Canada, another for warehouse distributors and original equipment manufacturers in Canada and for exportation to Aimco, Buffalo, and a third for exportation to other countries. (Exhibits 6, 7, and A.) Exhibit 6 was stated to be the pricelist for warehouse distributors and original equipment manufacturers in Canada and for exportation to Aimco, Buffalo. It is undated and is headed "Confidential," but otherwise there is nothing on it to indicate that the prices were limited to a particular class or classes of customer. Exhibit 7 is said to be the pricelist to bonders in Canada. It is dated December 1962 and mentions terms, discounts, and conditions, and the letter accompanying it is addressed "To Our Customers," but again there is nothing thereon to indicate that it was meant for a particular class or classes of customer. A pricelist for "Export," dated February 1, 1963, is attached to exhibit A.

According to Mr. Goodman, the merchandise was invoiced to Aimco, Buffalo, at the prices shown in exhibit 6, which were lower, because Aimco, Buffalo, had to resell to bonders in the United States and the price had to be competitive. The prices in exhibit 6 were determined after Aimco, Canada, had made a survey of the American market and the American prices for this type of merchandise found. The merchandise was then sold to Aimco, Buffalo, at the American price, less 20 percent. Mr. Goodman stated that 20 percent was the normal discount in the automotive industry for a warehouse to operate and function with service and at a profit. Aimco, Buffalo, absorbed the duties and shipping expenses in the 20 percent. The prices did not vary with the quantities and included the cost of containers and coverings and all other expenses incidental to placing the goods in condition, packed ready for shipment to the United States. There were no restrictions on resale or use.

Discounts were given to Canadian bonders for quantity purchases. Some sales were made at the appraised values, less 5 percent and less 2 percent, but according to the witness Goodman, sales were also made at discounts of 8 percent for 20,000 shoes or more per order. However, exhibit 5, a summary of sales made by Aimco, Canada, during April and May 1963, does not show any sales for home consumption at a discount of 8 percent. Most sales were at no discount, a number at

5 percent discount and two at 10 percent discount. Aimco, Buffalo, ordered in minimum quantities of 50,000 shoes per order.

In Mr. Goodman's opinion, the selling prices to Aimco, Buffalo, fairly reflected the market value because they were necessary in order for Aimco, Buffalo, to resell at a profit in the American market. The conditions and practices under which Aimco, Canada, sold to Aimco, Buffalo, were normal with respect to sales of its unfinished brake-shoes to the United States for the last 7 years. There were no other Canadian exporters of unfinished brakeshoes during the period involved herein. Aimco, Canada, would have been willing to sell to others in the United States at the same prices if the purchaser was financially able to support the warehouse operation and pay for the goods shipped.

For the purpose of establishing that the invoice prices fairly reflected the market value, plaintiff introduced evidence directed toward showing that such prices were equal to the sum of the production costs, general expenses entering into export trade, and profit, and that there were expenses incurred in making sales in Canada which were not incurred in making sales to the United States.

Mr. Goodman had Mr. Carter under his supervision make a calculation of the cost of production of the seven size ranges of the merchandise based upon actual production, not from any accounts. This was received in evidence as plaintiff's collective exhibit 4.

Another compilation showing costs additional to those on exhibit 4 and profit was prepared by Mr. Feldman from the books and records of the company and other information given to him. It was received in evidence as plaintiff's exhibit 8.

Mr. Feldman testified that the allowance for general expense on exhibit 8 is 2 percent of the United States export price to Aimco, Buffalo. It was arrived at by rounding out "the proportion of the costs incurred in Canada as a percentage of the sales price to Aimco, Buffalo." The profit item, 11.30, is the difference between the United States export price and the total of the manufacturing and general expense cost. The profit on some of the other item numbers, included in the 7-inch size, in exhibit 4, might be up or down. To calculate profit on the other items, the United States sales price would be obtained, 2 percent thereof used as general expenses, and the difference would be the profit.

Mr. Feldman also prepared a schedule showing the Canadian sales prices, less certain deductions, thus indicating the net Canadian sales prices in the home market. This was received in evidence as plaintiff's exhibit 9. Exhibit 10, which he also prepared, purports to explain the adjustment in home market prices for selling costs in the home market not incurred in exporting.

In a letter from Mr. Goodman to the Commissioner of Customs, it is stated:

Our company manufacturers [sic] brake shoes for export to the World Market competitively. It is a normal procedure for any manufacturer who exports to offer his products competitively to the market he is seeking to sell. Our pricing in the United States market is shown at its final competitive price in the summary (No. 4A). In our letter to C. J. Towers, we outlined that a complete understanding had been mutually agreed upon with the Buffalo Customs. If a discussion was held with a panel of businessmen you will find that each large manufacturer sells competitively to each market and for this reason our pricing for home consumption was kept at a higher competitive level. It was not necessary for us to sell cheaper at home as our prices were set according to volume sales acceptance in this market. If at any time your chief appraisers at Buffalo would have questioned our higher pricing, we would have proven to them that this is not detrimental to our United States sales, as we could have adjusted them to be equalled. Each market has its own level. We cannot understand how our competition is hurting a major industry, since we do not sell our product below our competitors pricing. Each sale made by us is profitable, and for this reason we continue to progress with sales throughout the world.

The record presented establishes that "such" merchandise was sold for exportation only to a selected purchaser, Aimco, Buffalo, by Aimco, Canada, in the ordinary course of trade; that there were no other Canadian producers or exporters of such or similar merchandise; that the prices to Aimco, Buffalo, did not vary with the quantity; and that there were no restrictions as to disposition or use. The issue thus is whether the prices to Aimco, Buffalo, fairly reflect the market value and constitute the export value, as defined in section 402(b), *supra*. While the merchandise was appraised on the basis of constructed value, that value is the same as the list price to bonders in Canada, less 5 percent, and 2 percent, as shown by exhibit 7. That price includes all of the expenses incurred in sales to both the Canadian and the United States market, listed in exhibit 10.

In *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841, merchandise was sold by Acme Canada to Acme Chicago, its parent company, at prices lower than it sold to its customers in Canada. The merchandise was appraised at the entered unit values, plus 27.40 percent, on the basis of constructed value, which represented part of the difference between the home market price and the export price to the United States. Sales in Canada were made directly to users and the expenses included selling, distribution, advertising, travel, and entertainment, warehousing, freight, and repair and maintenance of tools supplied to customers, which expenses were not required in connection with sales to the United States. The appellate division of the Customs Court found that the export price differed from the domestic price

only to the extent of the amount of the said expenses; that the deduction fairly represented savings effected by the elimination of several items comprising selling expenses; that the invoice prices were equal to the sum of the production costs, general expenses entering into export transactions, and profit. The prices in the home market were considered for the purpose of determining whether the price to the selected purchaser in the United States fairly reflected the market value. The court held that it did and, therefore, found an export value existed and that it was represented by the invoiced and entered values. The court of appeals affirmed, stating (p. 89):

We find ourselves in harmony with the view expressed by the majority that all sales in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise and that evidence of price, and hence of the value of goods in the foreign market, is relevant to the ultimate determination of the export value of imported merchandise within the ambit of section 402(b) of the Tariff Act of 1930, as amended, *supra*, in the case of sales to selected purchasers.

* * * The record further shows that, for a reasonable time prior to the importation under consideration, it was the usual and normal practice for the manufacturers and sellers of identical merchandise to offer their goods for sale both for domestic consumption to industrial users, and for exportation to the United States, to one selected purchaser for distribution and resale. The merchandise sold in carload lots for home consumption included expenses of sale while that sold for exportation to this country excluded such expenses.

That case differs from the instant one in that there, the *quantum* of home market selling expenses was not at issue. Here, it is the crux of the dispute between the parties. I follow the *Acme* case, of course, but I still must determine here, if plaintiff has shown the selling expenses in a sound and satisfactory manner, as the burden rests on it to do.

In a subsequent case, *John V. Carr & Son, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860, merchandise was sold to a related company in the United States at lower prices than it was sold in Canada. There was evidence that the price to the American purchaser was the highest it would pay and the lowest the Canadian firm would accept. There was also evidence that the difference in price was due to the allocation of certain "fixed items" to the Canadian operation only. These were defined as "such fixed items of overhead that we would incur in Canada for Canadian production whether we did or did not sell to the United States, such things as taxes, insurance, depreciation, and other fixed elements of that nature that we would incur anyway." The court held, two judges dissenting in separate opinions, that:

* * * the assignment of fixed costs to the extent and in the manner disclosed arbitrarily excludes a fair proportion of overhead expenses

relating to cost of production which are reasonably and normally chargeable to export operations. We must therefore affirm the holding of the Customs Court that the record is insufficient to establish statutory export value.

The *Acme Steel* case was distinguished on the ground that it involved selling expenses, and not fixed costs of production.

The dissenting judges in the *Carr* case held in substance that the involved sales "fairly reflected market value" if they were set at the price level they were to meet United States competition. The evidence herein reflects that United States competitive prices were the main factor influencing the fixing of invoice prices to Aimco, Buffalo. However, no sufficient detail transpired as to United States price levels to permit considered comparison between them and the prices involved, to determine by that means if the export price fairly reflected market value, even though this case was tried before the *Carr* opinions were made public. Hence, the appeal here could in no view of the law be sustained on that standard. Plaintiff tried the case and has briefed it on the theory that to prevail it must compare the invoice prices with Canadian home market prices (where Aimco is the sole producer) for such or similar merchandise, and must justify any differences shown with differences in the conditions and cost of serving the home market. A difference not so accounted for would compel me to find that plaintiff had failed to show that the invoice prices fairly reflected market value, no other standard of measurement being available. I do not understand this to mean, however, that the home market prices must, after adjustments I approve, exactly correspond. I would be satisfied with a reasonable approximation of correspondence: this I deduce from the word "fairly." If plaintiff fails to show such approximation, I cannot find an export value and, therefore, the appraisement based on constructed value must stand.

There was a relatively small volume of sales to third countries "offshore." These in no way help plaintiff as they were at prices higher than the Canadian bonder prices.

The pricelists, exhibits 6 and 7, show, respectively, the applicable United States export and home market prices. The export prices were, in fact, during the period involved, prices to Aimco, Buffalo, only, but they would have been available to Canadian original equipment manufacturers and were offered to them. However, Aimco's product did not meet their specifications and no sales to them were made except a single large one to Chrysler, not in the ordinary course of business nor during the period involved. Plaintiff does not argue that *offers*, without sales to original equipment manufacturers, establish a market value, and, in the state of the evidence, such a measure would be too speculative to use. The actual home customers were, in fact, all "bonders" who combined plaintiff's product with asbestos

linings to make a finished brakeshoe. The excesses in the pricelist for bonders, exhibit 7, of December 20, 1962, over the prices to Aimco, Buffalo, in exhibit 6, are what plaintiff undertakes to account for and justify.

Exhibits 8, 9, and 10, reflect the accountant's calculations endeavoring to do this.

Plaintiff's accountant witness, in exhibit 10, takes four categories of cost totaling $74,795.13, which he says were applicable to home market sales alone and were not incurred in sales to the United States. He applies this figure to the total home market sales of $331,913.20, to get a percentage of 22.53. Both figures of course relate to the brakeshoe division of the company alone and to the fiscal year ending July 31, 1963. He deducts from the home market list prices, the 8 percent discount he says was allowed, and the 22.53 percentage already stated. The result, plaintiff claims, brings the price to bonders at, near, or below the price corresponding items to Aimco, Buffalo.

The court has considered the four items making up the $74,795.13. The first item, $20,698.37 for warehousing, appears reasonable and is approved. Brakeshoes sold to Aimco, Buffalo, did not require warehousing because that company maintained an inventory in its own warehouse. The warehousing was entirely for the Canadian bonders, who, the record shows, were accustomed to order in small lots. The figure is based on allocating 43 percent of the rent, light, heat, etc., of the Cooksville, Ontario, plant to warehousing as 43 percent of the floor space was used for warehousing.

The next item takes a figure of $30,239.38, management drawings and expense, apparently the compensation and expenses of the witness, Mr. Goodman. Of this the Canadian market was apportioned 80 percent and the United States 20 percent, apparently on the basis that Mr. Goodman told the accountant he spent 1 day out of 5 on United States sales. The United States market apportionment is then deducted from the Canadian apportionment, the balance, being "excess," $18,143.62, assigned to Canadian sales expenses. By somewhat similar reasoning out of a total of $32,954.48, representing the general, office, and administrative expenses of the brakeshoe division, $23,068.14 is assigned to Canadian selling expenses.

These calculations seem entirely divorced from reality. Mr. Goodman, according to his own testimony, was general manager in charge of production as well as sales. Presumably the office expenses referred to were applicable also to production as well as sales. All production was at the Cooksville plant, and ran at that time, according to plaintiff's brief, 649,160 units for the United States market against 134,003 for the home market. Selling in Canada was easy; there was no competing company. They employed but one salesman at a cost of $12,885,

all properly allocated to home sales, I find. No commission expense is claimed. It is incredible that no part of Mr. Goodman's and the office force's time was devoted to production, yet the accountant in his exhibit 10 calculations takes no account and makes no allowance for it. Production overhead and general expense, according to the *Carr* decision, must be allocated in proportion to the allocation of production between the home market and export to the United States. Because the figures of management salary and expenses $18,143.62, and general office and administrative expenses, $23,068.14, do not identify expense assignable to production, which they cannot but include, they cannot be used in ascertaining the market value of the imported merchandise. The accountant stated that these figures excluded expenses not incurred in sales. But he also stated that his starting "gross" figures were from a fiscal year financial report not in evidence, so he could not have made adjustments not shown in the exhibits before this court. Schedule 4 to exhibit 10 reads in part, e.g., as follows:

Total company expenses as follows:
Telephone and telegraph_____ $9,012.38

If $9,012.38 were not the entire telephone and telegraph costs of the company in the fiscal year, he used words very carelessly. His calculation, to be correct, therefore, would require us to suppose that not a single telephone call or telegram related to production rather than sales, and so all along the other items. I would approve a calculation that embodied a reasonable allocation of expenses to production. The court will not guess or speculate what amount of management drawing and expense and general office expense would be correctly allocable to Canadian sales. It will point out, however, that allowing the established items in full and these two items one-half each, would reduce the selling expense adjustment in the Canadian home sales from 22.53 percent to under 17 percent and the adjustment then would fail entirely to reduce the sales to Canadian bonders to the level of the sales to Aimco, Buffalo.

The accountant in preparing exhibit 9 took an 8 percent figure as a "trade discount" off home market sales. He said he got this from "a price list," presumably exhibit 7 of December 1962, but according to that exhibit, that discount could be earned only by a single order for 20,000 or more brakeshoes. Five percent was available for an order of 5,000 or more and 2 percent could be taken for payment within 10 days. Exhibit 5, a tabulation of home market sales in April and May 1963, does not reflect a single order that earned 8 percent and only a few that earned 5 percent. A new pricelist of May 6, 1963, allowed 5 percent on each order of 2,000 shoes, 10 percent on 5,000, 15 percent on 15,000. Exhibit 5 shows only two orders that were allowed 10 percent, none 15 percent. Mr. Goodman gave different discount figures

from memory but admitted he would have to consult the records to be sure. It is clear, therefore, that the accountant's 8 percent was not an actuality in most sales in the home market but only an optimum, and was not accurate even as that. The figure, to be informative, should have shown mean or average discounts earned. In its 22.53 percent adjustment to the home market prices, plaintiff seeks to eliminate from comparison price enhancement due to conditions in the home market, including the necessity of selling in small quantities out of warehouse. Plaintiff cannot have this, and also an 8 percent adjustment that assumes buyers purchasing in large quantities to earn maximum discounts. The two adjustments are predicated on conflicting assumptions.

Finally, out of 143 shoe models imported in the entries under review, the court has selected the 21 imported in numbers of 4,000 or more. To these it adjusted the Canadian bonder's price by the same adjustments as the accountant made in exhibit 9, excessive as these have been shown to be. The result in 14 instances was that, after adjustment, the bonder's price still exceeded the invoice price to Aimco, Buffalo. In one instance, it was almost the same and in six instances it was slightly lower. The tabulation follows:

| Quantity | Item No. | United State price (exhibit 6) | Canadian price (exhibit 7) | Adjusted Canadian price |
|---|---|---|---|---|
| 4,000 | 9 | .26 | .37 | .2572 |
| 9,600 | 11 | .27 | .37 | .2572 |
| 6,100 | 12 | .27 | .40 | .2780 |
| 4,400 | 80 | .29 | .50 | .3475 |
| 4,900 | 81 | .31 | .55 | .38225 |
| 24,500 | 84 | .27 | .44 | .3058 |
| 5,980 | 85 | .27 | .47 | .32665 |
| 8,150 | 113 | .25 | .37 | .2572 |
| 13,300 | 115 | .27 | .37 | .2572 |
| 14,100 | 120 | .27 | .42 | .2919 |
| 9,314 | 148 | .28 | .46 | .3197 |
| 4,350 | 154 | .32 | .45 | .31275 |
| 5,300 | 155 | .33 | .45 | .31275 |
| 8,150 | 158 | .31 | .38 | .2641 |
| 7,150 | 159 | .33 | .40 | .2780 |
| 5,950 | 160 | .32 | .47 | .32665 |
| 5,150 | 161 | .30 | .45 | .31275 |
| 25,100 | 174 | .27 | .42 | .2919 |
| 4,100 | 177 | .38 | .70 | .4865 |
| 4,500 | 180 | .35 | .52 | .3614 |
| 6,600 | 189 | .30 | .50 | .3475 |

There seems no reason to doubt that an excess of home market prices over the invoice prices would remain in all 21 cases if instead of 8 percent, an adjustment were made for mean or average discounts earned, and if the elimination of home market selling costs were properly calculated. Whether this is so or not, the evidence in this case fails to show by the home market prices that the invoice prices fairly reflect market value, whether before or after proper adjustment for home market selling expense.

It may be noted that exhibit 8 was admitted after defendant withdrew its objection on the basis that it described only what defendant's counsel called "the so-called price structure of the particular brake shoes which are listed." As nothing more was said, by plaintiff's counsel or the court, it must be deemed admitted for that limited purpose only. It purports to show the profit derived in selling to Aimco, Buffalo, at invoice prices, seven types of brakeshoes. It allows only 2 percent for general expenses, which hardly seems a realistic figure, nor to have been based on the actual content of books and records. There is no evidence to show the profit derived from the remaining 136 models, the limitation on exhibit 8 apparently removing it from consideration as representative or typical of these other models. However, it does not seem necessary or helpful at this time to know the actual profit derived from selling these shoes.

Exhibit 9 was admitted over defendant's objection and exception. Counsel perhaps supposed that this sheet of accountant's calculations if admitted would have evidentiary validity independent of its foundation in other evidence. This is not the case. As I have shown, it uses an 8 percent "trade discount" figure which other evidence establishes to be unrealistic. It does not prove that an average of 8 percent was actually allowed or that 22.53 percent of the price of the seven items analysed represented selling expenses incurred in the Canadian market not incurred in the United States market. The court is entitled to receive and consider material of this kind for whatever help it may be without being in any way bound by the accountant's conclusions. Defendant was not prejudiced by the admission of exhibit 9, which the court has used to establish the unsoundness of plaintiff's home market price adjustments. Defendant did not object to exhibit 10 which purports to substantiate the 22.53 percent figure. I have already shown it to be in part unsound and incorrect. Despite the absence of objection, it is of course not binding on me.

Other matters the plaintiff was required to prove, to sustain the claimed values, as, e.g., whether the market in which the merchandise was sold was the principal market in Canada, whether the course of dealing between plaintiff and Aimco, Buffalo, was the "ordinary course of trade," and whether there were restrictions as to disposition or use

of the merchandise by the seller, were not seriously at issue herein and in the view I take of the evidence, do not require findings by me. If an appellate tribunal takes a different view than I do as to the contested issues, the record will suffice for disposition of these others.

On the record presented, plaintiff has failed to establish that the claimed values fairly reflect the market value of the merchandise. Since the merchandise was sold for export only to one selected purchaser, no export value can be found pursuant to the terms of section 402 (b) and (f), *supra*. No evidence has been presented to establish a United States value. Therefore, the appraised values, presumptively correct, must stand.

I find as facts:

1. That the merchandise involved in this case consists of unfinished brakeshoes, exported from Canada and entered at the port of Buffalo, in April, May, and June 1963.

2. That the merchandise does not appear on the final list promulgated by the Secretary of the Treasury as T.D. 54521.

3. That the merchandise was appraised on the basis of constructed value, as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That said merchandise was produced and exported by Aimco Automotive Parts Co., Toronto, Canada, and that there was no other Canadian producer or exporter of such or similar merchandise during the period involved herein.

5. That during the period in question said merchandise was sold for exportation to the United States only to Aimco Automotive Parts Co., Buffalo, N.Y., a selected purchaser at wholesale. That the merchandise was sold to said purchaser at prices listed in plaintiff's exhibit 6.

6. That said merchandise was sold to Canadian bonders at prices listed in plaintiff's exhibit 7, which prices were higher than those listed in plaintiff's exhibit 6.

7. That the record fails to establish that the differences between the prices to Canadian bonders and those to Aimco, Buffalo, are substantially accounted for by the differences in the conditions and cost of serving the home market.

8. That the evidence fails to establish that the invoice prices to Aimco, Buffalo, fairly reflected the market value of the merchandise.

9. That at or about the time of exportation herein, such or similar merchandise was not freely sold or, in the absence of sales, offered for sale in the principal markets of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States to all purchasers at wholesale, or to a selected purchaser at wholesale at prices which fairly reflect the market value of the merchandise.

10. That no evidence was presented to establish the existence of a statutory United States value.

I conclude as matters of law:

1. That there is no export value and no United States value, as said values are defined in section 402 (b) and (c), respectively, of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, for the merchandise involved herein.

2. That constructed value, as that value is defined in section 402(d) of said tariff act, as amended, is the proper basis for the determination of the value of the merchandise herein.

3. That said value is represented by the appraised values herein.