(R.D. 11289)

F. W. MYERS & Co., INC. v. UNITED STATES

Entry Nos. F-8714; F-8764; F-9101.

(Decided April 12, 1967)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff. *Barefoot Sanders*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

RAO, Chief Judge: The merchandise involved in this appeal for reappraisement consists of rubber doors exported from Canada in February 1962 by W. B. McGuire Engineering Co., Ltd., and entered at the port of Champlain, N.Y., by the plaintiff for the account of The Peelle Co. of Brooklyn, N.Y. The merchandise was invoiced and entered at various unit prices, less 45 percent, and less $6.30 for nameplate, final polishing, and literature. It was appraised at the unit invoice prices, less $6.30, less 10 percent, on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Plaintiff claims that the dutiable export value is represented by the entered values. An alternate claim for appraisement on the basis of constructed value, as that value is defined in section 402(d) of said tariff act, as amended, has been abandoned.

At the trial, Winston B. McGuire, president of W. B. McGuire Engineering Co., Ltd., testified that his firm manufactures rubber flexible traffic doors, pneumatic tube systems, dock covers, and door seals, and that he is familiar with the operations and policies of his company. A brochure illustrating the kind of doors involved herein was received in evidence as plaintiff's illustrative exhibit 1. The witness explained that certain industrial and commercial establishments require quick passage through door openings and that these doors, being flexible, facilitate the flow of traffic, which in modern industry is heavy, moves fast, and involves greater loads than formerly. The doors made by his company are not in standard sizes but are made to fit an existing opening or a planned opening. In order to manufacture them, the company must have a drawing or blueprint indicating the opening size and the construction of the door opening. Such drawings must be specifically prepared in each case. Typical blueprints showing the specifications needed were received in evidence as plaintiff's collective illustrative exhibit 4.

Mr. McGuire stated that in his capacity as president he has engaged in selling in the United States and Canada and has done quite a lot of traveling in Canada. He has kept abreast of his competition and, to the best of his knowledge, there is, and was in 1962, no other Canadian manufacturer of flexible doors of the kind his firm produces.

Mr. McGuire testified that his firm had a standard Canadian selling pricelist. A copy of the one in effect in February 1962 was received in evidence as plaintiff's exhibit 2. In negotiating selling prices with The Peelle Co., Mr. McGuire said:

We used our standard Canadian selling price list, and we had a discount structure based on quantity. In other words, when any party would contract to purchase more than one pair of doors, up to the range of a hundred our discounts were established to match that. * * *

He explained that the discount schedule was as follows:

| | |
|---|---|
| 1 to 5 doors | 10% |
| 6 to 24 doors | 15% |
| 25 to 49 doors | 25% |
| 50 to 99 doors | 35% |
| Over 100 doors | 45% |

He testified that The Peelle Co. was granted a discount of 45 percent on the basis of a verbal agreement that it would purchase a minimum of 100 doors a year, which doors might be purchased at any time during the period. In fact, orders, with specifications, were placed by The Peelle Co. at different times during the year, and payment was made 30 days from date of shipment at list prices, less 45 percent. Said discount of 45 percent was conditioned upon Peelle's agreement to purchase 100 or more doors a year. If the purchaser had not done so, prices would have reverted to the discount scale agreed upon, depending upon the number of doors bought during the year. If, despite the contract to purchase 100 doors, only one had been taken, the difference between 45 percent and 10 percent would have been payable to the seller by Peelle. However, in the years 1961 and 1962, Peelle did purchase more than 100 doors per year and received the 45 percent discount inasmuch as it was fulfilling its agreement.

Lists of sales to The Peelle Co. of flexible rubber doors for the years 1961, 1962, and 1963, prepared by Miss Helen Shaw of the McGuire Co. from copies of invoices, were received in evidence as plaintiff's collective exhibit 3. They indicate that doors were ordered on various dates throughout 1961 and 1962 and through July 8 of 1963 in quantities of 1 to 6 on any one date and that the totals for 1961 and 1962 were in excess of 100.

In return for the 45 percent discount The Peelle Co., according to the witness, relieved the seller of a very heavy burden of expense. This included the advertising cost involved in selling these doors in the United States, commissions paid sales representatives in the United

States, the cost of having the necessary drawings or blueprints drawn up, and the expense of communicating with sales representatives throughout the United States. Expenses for comparable items were incurred by the seller when the merchandise was sold in Canada.

Cost of production records for the doors involved herein were received in evidence as plaintiff's collective exhibit 5. These give costs for the various materials used, plus 2 percent for waste, plus the cost of labor. They note the difference between the total cost of fabrication and the selling price and apportion the difference between overhead (20%) and profit (varying from 18 to 40%). Mr. McGuire said that the costs of material and labor represented the cost of all fabrication and processing at a time preceding the date of exportation which would ordinarily permit the production of these doors in the ordinary course of business. He said that overhead included rent, salaries of office personnel, fixed costs, and all expenses other than actual labor and materials. Some drawback was received on rubber but not in excess of 10 percent. The witness explained that the allowance in the invoices for nameplate, final polishing, and literature was due to the fact that, when doors are manufactured in Canada, the seller's nameplate is placed on them, they are polished, and installation instructions and guarantee are enclosed. Peelle used its own nameplate and instructions and guarantee.

The cost sheet for doors 8 inches wide and 10 inches high, for example, shows a cost of $216.43 for material and fabrication and a selling price of $229.50. (All prices are in Canadian currency.) Twenty percent of the difference is attributed to overhead and 19 percent to profit. The Canadian pricelist gives a price of $556 for doors of this dimension. That is the invoice unit price, from which 45 percent and $6.30 are deducted, giving a total of $229.50, the entered value.

According to Mr. McGuire, the cost of materials, labor, and overhead on the cost sheets was the same for doors produced for the Canadian home consumption market and for export to the United States, but there were other expenses incurred in order to stay in business in Canada—advertising, commissions to sales representatives, and costs for the preparation of drawings.

Mr. McGuire testified on direct examination that, in February 1962, his firm was not selling to anyone in the United States except The Peelle Co., but said later that it may have sold also to W. B. McGuire Co., Inc. (hereinafter called the McGuire Co.). A letter from the latter to W. B. McGuire Engineering Co., Ltd., dated January 4, 1962, was received in evidence as defendant's exhibit A. It states:

We agree to purchase from you a minimum of one hundred (100) McGuire Rubber Doors for the Year 1962.

Under these arrangements we qualify for a distributor's discount of 45% as per your schedule dated January 3, 1958.

Mr. McGuire testified that he could not tell from the statement whether his firm was shipping doors under this agreement. He did not remember that Mr. Beetler, who signed the letter, made any sales. If there were any, the McGuire Co. and The Peelle Co. were the only two companies in the United States to whom his firm was selling at that time. He stated that the conditions and practices under which he sold to The Peelle Co. were normal for a year prior to February 1962; that the selling prices to it were f.o.b. Montreal; and that no restrictions as to use or disposition of the merchandise were imposed.

Mr. Joseph N. Sproule, vice president in charge of sales of The Peelle Co., testified that the business of the company is the manufacture of freight elevators, dumbwaiters, and industrial doors, including rubber doors such as involved herein. In fact, the firm bought these rubber doors with the intention of fabricating such items themselves at a later date. They were purchased for resale to manufacturers' representatives and general contractors. Their ultimate use is in industrial plants and commercial buildings. The witness said he negotiated the original purchase verbally with Mr. McGuire at which time the 45 percent discount and the quantities were fixed. He negotiated the best price he could in recognition of the marketing work the firm had to do to establish the product in the United States. His firm gave the merchandise its own name in the United States, prepared catalogs, conducted advertising and direct mail campaigns, set up sales representatives, modified the product to suit the United States market, and prepared design drawings.

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended, are as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*        \*        \*        \*        \*        \*        \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B)   in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2)   The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*         \*         \*         \*         \*         \*         \*

(5)   The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

It is not disputed that the merchandise was sold for export only to a selected purchaser or purchasers; that there were no other Canadian manufacturers of doors of the kind involved herein; that Montreal was the principal market; and that no restrictions were made as to the disposition or use of the merchandise by the purchaser.

Plaintiff claims that under the definition in section 402(f)(5), *supra*, the usual wholesale quantity was 100 doors, since the importer agreed to purchase and did purchase 100 doors a year, and that that quantity was the one quantity in an aggregate volume which was greater than the aggregate volume sold in any other quantity. Defendant contends that the usual wholesale quantity was one door on the ground that *sales* were made from time to time during 1961 and 1962 and that sales in the quantity of one door were in an aggregate volume greater than sales in any other quantity.

While the terms of the verbal understanding between the purchaser and the seller are far from clear, they appear to spell out a contract to purchase rather than a sale.   (Sec. 1, Uniform Sales Act; Williston on Sales, revised edition, 1948, vol. 1, pp. 2–4, 14–15.)   However, under the circumstances of this case, that distinction is not relevant. Here, if individual orders are taken as sales, there is no variance in price on the basis of quantity, since all received the 45 percent discount.   Thus, it would be unnecessary to find usual wholesale quantity. The same result is reached if the agreement to purchase, which became an executed contract, is considered the sale.   Offers at other discounts for different quantities cannot be considered since there were sales

at the 45 percent discount and none at the other discounts. *Delmonico International Corp.* v. *United States*, 52 Cust. Ct. 656, A.R.D. 176; *Louis Goldey Co., Inc.* v. *United States*, 55 Cust. Ct. 759, A.R.D. 196. That there might have been additional charges if plaintiff had not purchased a total of 100 doors a year is purely speculative.

The issue before the court is whether the plaintiff has established that the prices claimed fairly reflect the market value of the merchandise.

In determining this issue, it has been held that all sales, including those in the foreign market, may be considered, and that, in comparing prices in the home market with those for export, expenses of sale in the former not incurred in the latter may be deducted. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841. The court in that case quoted with approval the following statement of the Customs Court:

The record in the instant case does, * * * establish that included in the price at which such merchandise is sold for home consumption in Canada were certain selling expenses which were not incurred in export transactions; that the export price differs from the domestic price only to the extent of the value of said expenses; and that the 30 per centum deduction fairly represents the savings in cost effected by the elimination of the several items comprising selling expenses.

It also establishes that the invoice prices were equal to the sum of the production costs, general expenses entering into export transactions and profit, and that such prices fairly reflected the market value for exportation to the United States.

This we consider to be substantial evidence of a price which embodies all of the material elements entering into the new statutory definition of export value in the case of sales to one or more selected purchasers. * * *

In *John V. Carr & Sons, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860, there was a marked discrepancy between the Canadian home market and the export selling prices not attributable to expenses indigenous to Canadian operations and sales. The court held that the assignment of certain fixed costs to the Canadian operation excluded a fair proportion of overhead expenses relating to cost of production which was reasonably and normally chargeable to export operations.

See also *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 56 Cust. Ct. 653, R.D. 11152, application for review dismissed, 57 Cust. Ct. 749, A.R.D. 213, where the evidence was held insufficient to establish that the differences between the Canadian home market and the export selling prices were attributable solely to higher expenses of sale in Canada. The court found that some of the expenses were attributable to production costs and that in many instances, even after the claimed adjustment was made, the Canadian prices were higher.

It held that the evidence failed to show by the home market prices that the invoice prices fairly reflected the market value.

In the instant case, plaintiff has placed in evidence a pricelist which Mr. McGuire said was the manufacturer's standard selling pricelist for home market sales and was in effect during the month of February 1962. This gives prices f.o.b. Montreal or Toronto, terms—net 30 days. It does not mention any discounts. Mr. McGuire testified that there were sales in Canada but no list of sales was produced. The testimony does not establish whether or not the sales were made in accordance with the pricelist, whether or not any discounts were granted, or the class or classes of purchaser to whom the merchandise was sold. The statement in the McGuire Co. letter quoted above is some indication that there was a discount schedule as far back as 1958, but there is nothing to show whether or not discounts were granted in the home market, or in the export market to anyone but The Peelle Co. or possibly the McGuire Co.

The witness said that the sales in Canada involved certain expenses not incurred in sales for export, including the cost of advertising and blueprints, and selling commissions, and that the costs for such items were borne by The Peelle Co. when the merchandise was sold for export to the United States. When the charge of $6.30 and the 45 percent discount are deducted from the Canadian list prices, the result equals the invoiced and entered values. The discount is said to be due to the fact that the aforementioned expenses were borne by the purchaser. It is also stated to be a quantity discount.

Plaintiff also relies on the cost of production figures to show that the export price fairly reflects the market value. Mr. McGuire testified that the cost of materials, labor, and overhead were the same for doors produced for sale in Canada and for those produced for export to the United States. However, the cost sheets show that varying amounts were added for profit on sales to the United States in order to equal the selling price. Whether the profit added in sales in Canada was the same in not stated. Even if it were, the difference of 45 percent would have to be accounted for.

It may well be that the expenses for advertising and selling incurred in Canada could properly be deducted from the selling price in Canada when comparing it with the price for export in order to determine fair market value under the principle in *United States* v. *Acme Steel Company, supra.* The same may be true of the cost of preparing blueprints where such costs were not incurred by the manufacturer in sales for export. Although the cost of pattern equipment and designs has been held to be part of cost of production (*United States* v. *Pacific Customs Brokerage Co. for Munising Wood Products Co., Inc.*, 32 Cust. Ct. 675, A.R.D. 44; *Fergus Imported Cars, Inc.* v. *United States,*

52 Cust. Ct. 437, Reap. Dec. 10675), the issue here is not what is cost of production but what is fair market value.

However, no figures have been presented showing the actual amount of the expenses claimed to have been incurred in Canada nor has any evidence been produced from which the court can determine whether the entire 45 percent is accounted for by such expenses or whether some of them are properly allocable to production costs or other general expenses not attributable solely to the Canadian operation. There is some evidence that the advertising cost in Canada may have been 16 percent, but there is nothing to show the cost of drawings or selling commissions. A number of recent cases have held that the claimed differences must be itemized or shown specifically in order that the court may determine whether the price for export fairly reflects market value. *Union Carbide Corporation* v. *United States*, 55 Cust. Ct. 542, Reap. Dec. 11039 (application for review pending); *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 55 Cust. Ct. 586, Reap. Dec. 11058 (application for review pending); *C. J. Tower & Sons of Niagara, Inc.* v. *United States*, 57 Cust. Ct. 601, R.D. 11212 (application for review pending).

That such a breakdown is necessary where the quantum of the claimed home market expenses is in dispute is well illustrated by the *C. J. Tower & Sons of Buffalo, Inc.*, case in 56 Cust. Ct., *supra*. In that case, schedules and breakdowns were presented from which the court concluded that some, but not all, of the claimed expenses could properly be chargeable to Canadian home market sales only.

On the record presented, plaintiff has failed to establish that the claimed values fairly reflect the market value of the merchandise. Therefore, the appraised values, presumptively correct, must stand.

I find as facts:

1. That the merchandise involved herein consists of rubber doors exported from Canada in February 1962 by W. B. McGuire Engineering Co., Ltd., and entered at the port of Champlain, N.Y., by the plaintiff for the account of The Peelle Co. of Brooklyn, N.Y.

2. That the merchandise is not included on the final list published by the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521.

3. That said merchandise was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That said merchandise was produced and exported by W. B. McGuire Engineering Co., Ltd., Montreal, Quebec, the principal market in Canada, and there were no other Canadian manufacturers of rubber doors of the type involved herein.

5. That during the period involved herein said merchandise was sold for exportation to the United States to a selected purchaser or

purchasers at wholesale, without restrictions as to the disposition or use of the merchandise.

6. That there was a standard Canadian pricelist giving prices which were higher than the prices to the selected purchaser or purchasers for exportation to the United States.

7. That the selected purchaser or purchasers were granted a 45 percent discount from the standard Canadian list prices.

8. That the record fails to establish that the 45 percent discount allowed on sales to the selected purchaser or purchasers for exportation to the United States is accounted for solely by expenses of advertising, preparation of blueprints, and selling commissions claimed to have been incurred in sales in Canada and not in sales for export.

9. That the evidence fails to establish that the selling prices for exportation to the United States fairly reflect the market value of the merchandise.

I conclude as matters of law:

1. That the evidence does not overcome the presumption of correctness attaching to the appraised valuation.

2. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise involved herein.

3. That such values are the appraised values.